In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 18-1061

NICOLAS SUBDIAZ-OSORIO,

*Petitioner-Appellant,*

*v.*

ROBERT HUMPHREYS,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 14-cv-1227 — **Pamela Pepper**, *Chief Judge*.

---

ARGUED NOVEMBER 7, 2019 — DECIDED JANUARY 9, 2020

---

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Nicolas Subdiaz-Osorio stabbed his brother to death during a drunken fight. He attempted to flee the country but was stopped in Arkansas while driving to Mexico. Officers interrogated Subdiaz-Osorio in Arkansas and during the interview, after discussing the extradition process, Subdiaz-Osorio asked in Spanish, "How can I do to get an attorney here because I don't have enough to afford for

one?" The state courts were tasked with deciphering what "here" meant.

The state argued that the question referred to the extradition hearing "here" in Arkansas; Subdiaz-Osorio argued this was an unequivocal invocation of his right to the presence of counsel "here" in the interrogation room. The state trial court found, and the Wisconsin Supreme Court affirmed, that Subdiaz-Osorio did not unequivocally invoke his Fifth Amendment right to counsel.

The only issue in this habeas corpus appeal is whether that finding was contrary to or based on an unreasonable application of established Supreme Court precedent. *See* 28 U.S.C. § 2254(d). Our review is deferential and because the Wisconsin Supreme Court's finding was reasonable, we affirm the district court's denial of Subdiaz-Osorio's petition for writ of habeas corpus.

## I. Background

The relevant facts in this case are largely undisputed.[1] The details of the underlying murder and Subdiaz-Osorio's attempted flight do not bear on the issue before us, but we first recount those facts necessary to provide context. We then review the interrogation and the state court proceedings, which are the focus of this appeal.

---

[1] The facts are taken from the Wisconsin Supreme Court's lead opinion. *See State v. Subdiaz-Osorio*, 2014 WI 87, 849 N.W.2d 748 (Wis. July 24, 2014). The Wisconsin Supreme Court's findings are "presumed to be correct" and Subdiaz-Osorio has not attempted to rebut that presumption. *See* 28 U.S.C. § 2254(e)(1).

**A. The stabbing**

Nicolas Subdiaz-Osorio lived with his brother, Marcos Antonio Ojeda-Rodriguez, in a trailer in Kenosha, Wisconsin. The brothers also worked for the same employer and a few weeks before the incident, their employer laid off Ojeda-Rodriguez but retained Subdiaz-Osorio. This caused tension and arguments between the brothers.

The tension came to a head on the night of February 7, 2009, and carried over into the early morning hours of February 8. Late in the evening on February 7, Subdiaz-Osorio was in his bedroom with a friend and co-worker, Lanita Mintz. At some point, Ojeda-Rodriguez, who was either home or came home, tried to force his way into Subdiaz-Osorio's room. Subdiaz-Osorio tried to keep his brother out, but Ojeda-Rodriguez—a former boxer—was heavier and stronger than Subdiaz-Osorio and was able to overpower Subdiaz-Osorio and force his way into the bedroom.

When Ojeda-Rodriguez entered, he and Subdiaz-Osorio began arguing in Spanish. Mintz speaks little Spanish and could not understand what the brothers were saying, but she could tell both had been drinking. Things escalated quickly. The verbal argument lasted less than two minutes and ended with Ojeda-Rodriguez punching Subdiaz-Osorio in the face. The punch knocked Subdiaz-Osorio back into his dresser and to the ground. Subdiaz-Osorio got up and retrieved two knives from his closet.[2] Ojeda-Rodriguez said something

---

[2] Subdiaz-Osorio did point out that there was some conflicting testimony in the trial court regarding the knives. Subdiaz-Osorio initially told investigators that Ojeda-Rodriguez brought a knife into the bedroom with him and that Subdiaz-Osorio disarmed him. Subdiaz-Osorio later told

aggressive in Spanish to his brother, who was now armed with a knife in each hand, and pounded his chest. So Subdiaz-Osorio stabbed him in the chest. Ojeda-Rodriguez was unfazed, perhaps fueled by a combination of alcohol and adrenaline, and continued to pound his chest. Subdiaz-Osorio then stabbed his brother in the face, just under the left eye. The knife blade pierced Ojeda-Rodriguez's left eye socket and entered the right hemisphere of his brain. Ojeda-Rodriguez fell back into the wall and Subdiaz-Osorio began kicking and punching him in the face. Subdiaz-Osorio eventually stopped beating his brother and left the room.

The brothers' roommates came home shortly thereafter, saw Ojeda-Rodriguez, and helped carry him to his own bed. Mintz then left, but she remembered that Ojeda-Rodriguez was moving and speaking when she departed. Apparently no one thought Ojeda-Rodriguez's injuries were life-threatening. One roommate, though, did suggest calling the police. Subdiaz-Osorio refused because, as a shock to no one, he did not want to be arrested. Instead, Subdiaz-Osorio called his girlfriend—who was not Mintz—to come over and help take care of Ojeda-Rodriguez. She did and then they both left and went to her home. Despite the girlfriend's best efforts, the roommates found Ojeda-Rodriguez dead the next morning. At 9:27 a.m. on February 8, 2009, the roommates reported the stabbing to the Kenosha Safety Building.

Police officers and medical personnel arrived and found Ojeda-Rodriguez's body beaten and battered and with several stab wounds. They confirmed he was dead. The medical

---

investigators that Ojeda-Rodriguez never had a knife. This inconsistency is immaterial to our discussion.

examiner determined that the fatal stab occurred when Subdiaz-Osorio stabbed Ojeda-Rodriguez under his left eye, causing the blade to penetrate Ojeda-Rodriguez's brain three to four inches.

**B. The search for Subdiaz-Osorio**

Detectives quickly began their investigation and several Spanish-speaking officers interviewed the roommates and Subdiaz-Osorio's girlfriend. The girlfriend told officers that she let Subdiaz-Osorio borrow her car and gave them the license plate number along with Subdiaz-Osorio's cell phone number. The officers also learned that Subdiaz-Osorio was in the country illegally and had family in Mexico. They surmised that Subdiaz-Osorio had fled and was driving to Mexico. The Kenosha police put a "temporary want" on Subdiaz-Osorio into the Crime Information Bureau, a state system, and National Crime Information Center, a national system, that together notified all law enforcement agencies in the country about the temporary want for Subdiaz-Osorio.

But because the notification system for the temporary want was old technology, the Kenosha police also wanted to track Subdiaz-Osorio's cell phone location and contacted the Wisconsin Department of Justice (WDOJ). That same afternoon, February 8, the WDOJ filled out and submitted a "Mandatory Information for Exigent Circumstances Requests" form to Sprint, Subdiaz-Osorio's cell phone provider. Later in the afternoon the WDOJ received tracking information for Subdiaz-Osorio from Sprint. They did not have a warrant.

Subdiaz-Osorio was tracked to Arkansas, driving south on I-55. The Kenosha police alerted Arkansas police, and around 6:11 p.m., still February 8, an Arkansas patrol officer pulled

Subdiaz-Osorio over and took him into custody. The Arkansas police did not interrogate Subdiaz-Osorio that evening.

**C. The interrogation**

The next morning, on February 9, Detective David May and Detective Gerald Kaiser, the lead detectives, and Officer Pablo Torres, who is fluent in Spanish, travelled to Arkansas. Later that same day, Detective May and Officer Torres interviewed Subdiaz-Osorio in the Mississippi County Jail in Luxora, Arkansas.

Subdiaz-Osorio told the officers that he preferred they conduct the interview in Spanish, so Officer Torres conducted the interview in Spanish. There is no indication, and Subdiaz-Osorio does not argue, that either Subdiaz-Osorio or Officer Torres had any trouble understanding each other.

The officers videotaped the interview, portions of which were later played at the suppression hearing. During that hearing, a court interpreter contemporaneously translated the videotaped interview from Spanish to English.[3] The video began with Officer Torres administering the *Miranda* warning to Subdiaz-Osorio. After Subdiaz-Osorio acknowledged that he understood his rights, Officer Torres asked, "I would like to ask you a few questions what you recall what happened yesterday. Okay. Would you like to answer the question that I will ask you. Sir?" (All grammatical errors throughout appear in the original translation.) Subdiaz-Osorio responded,

---

[3] Importantly, there is no separate written and translated transcript of the interview. The only source of the verbatim conversation between Subdiaz-Osorio and Officer Torres in the record comes from the transcript of the suppression hearing, where the court reporter is transcribing the interpreter's realtime translation.

"Depending on what type of – Depending on the question, right?" Officer Torres then asked Subdiaz-Osorio to sign a written *Miranda* waiver form titled "Waiver of Constitutional Rights," which was also written in Spanish.

There was then an inaudible statement by Detective May, followed by this critical dialogue:

| | |
|---|---|
| Subdiaz-Osorio: | Are you going to I understand move me to Kenosha. |
| Officer Torres: | We aren't going to take you back to Kenosha. What happens is that you have to appear in front of a judge. And after you appear in front of a judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha. But we are not going to do that right now. We are not going to know that right now. |
| Subdiaz-Osorio: | *How can I do to get an attorney here because I don't have enough to afford for one.* |
| Officer Torres: | If you need an attorney--by the time you're going to appear in the court, the state of Arkansas will get an attorney for you. |

We emphasized the key statement by Subdiaz-Osorio. For clarification, counsel then requested the tape be rewound so that the interpreter could repeat what Subdiaz-Osorio said regarding an attorney. Unfortunately, the "clarification" is not particularly helpful here because the interpreter somewhat

stumbles over it, at least as it now appears in the written hear-
ing transcript. The interpreter translated Subdiaz-Osorio's
statement twice more when the tape was rewound as follows:

> "To get an attorney here because I don't have enough
> to pay for one."

> "And to get an attorney and to get an attorney of—
> from here because I don't have enough to pay, or I
> don't have to pay."

The original translation by the court interpreter, appearing in
the full dialogue above, is the version that all parties, and the
courts, used. Thus, we will too.

The interview continued after that for about an hour. The
Wisconsin Supreme Court found that Subdiaz-Osorio was
"very cooperative throughout the interview." *Subdiaz-Osorio*,
2014 WI 87, ¶ 28.

**D. Trial court proceedings**

Subdiaz-Osorio filed two pretrial motions to suppress all
statements and evidence that the police obtained after his ar-
rest. He primarily raised two grounds. First, he argued that
the warrantless search of his cell phone's location data vio-
lated his Fourth Amendment rights. Second, Subdiaz-Osorio
argued that Officer Torres failed to properly inform him of his
*Miranda* rights. The trial court denied both motions.

On the Fourth Amendment issue, the court found that
"tracking a phone on a public roadway is not a violation of
the Fourth Amendment because there is no legitimate expec-
tation of privacy on public roadways." *Subdiaz-Osorio*,
2014 WI 87, ¶ 33. "Alternatively, the court determined that

there were exigent circumstances because an alleged murderer was fleeing and was unpredictable." *Id*.

As to the post-arrest statements, the trial court concluded that Officer Torres did not fail to properly inform Subdiaz-Osorio or honor his *Miranda* rights because "Subdiaz-Osorio's question about an attorney was not a request to have an attorney with him during the interview; rather, Subdiaz-Osorio was asking about how he could obtain an attorney for the extradition hearing." *Id*.

Subdiaz-Osorio then pleaded guilty to an amended charge of first-degree reckless homicide by use of a dangerous weapon. The court accepted the plea and sentenced Subdiaz-Osorio to twenty years' imprisonment. Subdiaz-Osorio appealed the conviction and the denial of his suppression motions.

**E. Appeal to the Wisconsin Court of Appeals**

In an unpublished opinion, the Wisconsin Court of Appeals affirmed Subdiaz-Osorio's judgment of conviction. *State v. Subdiaz-Osorio*, 2013 WI App 1, 824 N.W.2d 927 (Wis. Ct. App. Nov. 15, 2012) (per curiam). The appellate court assumed for the purposes of the appeal, without deciding, that the evidence should have been suppressed and applied a harmless error analysis. The court then considered and rejected Subdiaz-Osorio's two suggested possible lines of defense that he might have pursued had the evidence been suppressed. The court of appeals concluded:

> In addition to the lack of persuasive value of the unsuppressed evidence, we note that the State's case for utter disregard, while perhaps not unbeatable, was strong, based on an eyewitness account. And

we also note that Subdiaz-Osorio obtained a signifi-
cant benefit from the reduction in charge from first-
degree intentional homicide to reckless homicide.

*Id*. ¶ 12. Any error was harmless and the court was "satisfied
beyond a reasonable doubt that Subdiaz-Osorio would have
accepted the same plea deal even if the suppression motion
had been granted." *Id*.

Subdiaz-Osorio petitioned the Wisconsin Supreme Court
for review, which the court granted.

**F. The Wisconsin Supreme Court's decision**

The Wisconsin Supreme Court confronted two issues for
review. The first involved "the increasingly busy intersection
between Fourth Amendment privacy considerations and the
constant advancement of electronic technology" and required
the court to "determine whether law enforcement officers
may contact a homicide suspect's cell phone provider to ob-
tain the suspect's cell phone location information without first
securing a court order based on probable cause." *Subdiaz-
Osorio*, 2014 WI 87, ¶ 2. Second, implicating the Fifth Amend-
ment, "whether the suspect effectively invoked his right to
counsel during an interrogation when he asked *how* he could
get an attorney rather than affirmatively requesting the pres-
ence of counsel." *Id*.

The answers to these questions fractured the court, in par-
ticular with respect to the Fourth Amendment issue, and re-
sulted in six separate opinions. Justice Prosser authored the
lead opinion,[4] which affirmed the decision of the court of

---

[4] According to the Wisconsin Supreme Court's Internal Operating
Procedures, "[i]f … the opinion originally circulated as the majority

appeals. Justice Bradley and Justice Crooks concurred solely
in the mandate and each filed a separate concurrence. Justice
Roggensack concurred solely in the mandate and filed a con-
currence that Justice Ziegler joined. Justice Ziegler, though,
also filed her own concurrence, which Justice Roggensack and
Justice Gableman joined. Finally, Justice Abrahamson dis-
sented.

The Wisconsin Supreme Court spilled the overwhelming
majority of ink on the Fourth Amendment issue. Justice
Prosser's lead opinion, for example, spent only six paragraphs
on the Fifth Amendment issue out of the forty-nine total par-
agraphs in the discussion section. Justice Crooks, Justice
Roggensack, and Justice Ziegler all wrote separately to ex-
press concerns with the lead opinion's broad pronounce-
ments regarding the Fourth Amendment, but all agreed with
the Fifth Amendment analysis and said nothing more on that
issue. Justice Bradley's concurrence agreed with the dissent
that the trial court should have granted the motions to sup-
press, but she agreed with the court of appeals that the error
was harmless. Justice Bradley's concurrence therefore fo-
cused on the harmless error analysis. Justice Abrahamson, in
her dissent, was the only justice to separately address the Fifth
Amendment issue.

Because the only issue before us in this habeas review is
Subdiaz-Osorio's invocation of his Fifth Amendment right to
counsel, we limit our summary to the Wisconsin Supreme
Court's opinion on that issue.

---

opinion does not garner the vote of a majority of the court, it shall be re-
ferred to in separate writings as the 'lead opinion.'" Wis. S. CT. IOP
§ III.G.4.

Five justices agreed that Subdiaz-Osorio did not unequivocally invoke his right to counsel when he asked about how he could get an attorney. *See Subdiaz-Osorio*, 2014 WI 87, ¶ 11 & n.5. The opinion concluded that Subdiaz-Osorio's question was equivocal, and therefore Officer Torres did not violate Subdiaz-Osorio's Fifth Amendment rights by continuing to question him. *Id*. ¶ 82. Specifically, from the translation at the suppression hearing, "it appear[ed] as though Subdiaz-Osorio was asking about the process of obtaining an attorney rather than asking for counsel to be present during the interview." *Id*. ¶ 86. The context is "important and a vital element in the totality of the circumstances." *Id*. ¶ 87. Immediately preceding Subdiaz-Osorio's question, Officer Torres had just explained the extradition process and told Subdiaz-Osorio that he would have to appear before a judge in Arkansas. "It was reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney for his extradition hearing, especially since Subdiaz-Osorio continued to answer questions and remained cooperative for the rest of the interview." *Id*. It recognized that "case law is clear that it is not enough for a suspect to say something that the interviewer *might* interpret as an invocation of the right to counsel. The invocation of that right must be unequivocal." *Id*. Justice Prosser concluded, "In this case it was not." *Id*.

The dissent viewed Subdiaz-Osorio's statement differently, focusing on his use of the word "here" in the question. *Id*. ¶ 213 (Abrahamson, J., dissenting). An ordinary, reasonable person would understand Subdiaz-Osorio to be asking how to get an attorney "at that place and time"—i.e., the interrogation room. *Id*. ¶ 214. The dissent also read the transcript to indicate that Officer Torres had ended the subject of the extradition hearing because he said "we are not going to

do that *right now*. We are not going to know that *right now*." *Id*. ¶ 217. Thus, "here" could only reasonably refer to the present time in the interrogation room, per the dissent. *Id*. ¶ 218.

## G. Federal habeas proceedings

Having exhausted his state court remedies, Subdiaz-Osorio turned to the federal courts for habeas relief. His petition for a writ of habeas corpus raised the same Fourth and Fifth Amendment challenges to his conviction.

The district court held that collateral review of Subdiaz-Osorio's Fourth Amendment claim was foreclosed because, applying *Stone v. Powell*, 428 U.S. 465 (1976), Subdiaz-Osorio had a full and fair opportunity to litigate the claim in state court at all three court levels. On the Fifth Amendment challenge, the district court found that the Wisconsin Supreme Court did not unreasonably apply clearly established federal law and did not make an unreasonable determination of the facts given the evidence, *see* 28 U.S.C. § 2254(d), when it held that a reasonable officer could have understood Subdiaz-Osorio to be asking how to get a lawyer to represent him during the extradition process. The district court denied the petition and also declined to issue a certificate of appealability.

Subdiaz-Osorio filed a notice of appeal and a request for a certificate of appealability, and we granted him a certificate of appealability with respect to his Fifth Amendment challenge only. We denied his subsequent motion to expand the certificate to include a Fourth Amendment claim.

## II. Discussion

"We review the district court's decision de novo, but our inquiry is an otherwise narrow one." *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc). Under the

Antiterrorism and Effective Death Penalty Act of 1996
(AEDPA), habeas relief should only be granted if a state court
adjudication on the merits (1) "was contrary to, or involved
an unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States;" or (2) "was based on an unreasonable determination
of the facts in light of the evidence presented in the State court
proceeding." 28 U.S.C. §§ 2254(d)(1), (2).

"[W]hen the last state court to decide a prisoner's federal
claim explains its decision on the merits in a reasoned opin-
ion," this presents a "straightforward inquiry" for the federal
habeas court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The
Wisconsin Supreme Court was the last reasoned-decision on
the merits, and thus we will focus on that decision and
"simply review[] the specific reasons given by the state court
and defer[] to those reasons if they are reasonable." *Id*. "A
state-court decision can be a reasonable application of Su-
preme Court precedent even if, in our judgment, it is an in-
correct application." *Schmidt*, 911 F.3d at 477. "A state-court
decision can be a reasonable application even if the result is
clearly erroneous." *Id*. And a state-court decision can be rea-
sonable even if the petitioner presents "a strong case for re-
lief." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Only if the
state prisoner shows that "the state court's ruling on the claim
being presented in federal court was so lacking in justification
that there was an error well understood and comprehended
in existing law beyond any possibility for fairminded disa-
greement." *Id*. at 103. "If this standard is difficult to meet, that
is because it was meant to be." *Id*. at 102.

As we have recently said, federal habeas relief from state
convictions is "reserved for those relatively uncommon cases

in which state courts veer well outside the channels of reason-
able decision–making about federal constitutional claims."
*Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc).
Federal habeas relief is not unheard of, but it is "rare." *Id*.

In our narrow review, we cannot say that the Wisconsin
Supreme Court's decision was an objectively unreasonable
application of controlling United States Supreme Court law.

## A. The Fifth Amendment's right to counsel

We begin with the relevant clearly established law, as set
forth by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). The
Fifth Amendment prohibits compelled self-incrimination.
U.S. Const. amend. V. This privilege is applied to state crimi-
nal defendants through the due process clause of the Four-
teenth Amendment. *See Dickerson v. United States*, 530 U.S.
428, 432 (2000). The Court reinforced the import of the funda-
mental right against self-incrimination in *Miranda*, which held
that "when an individual is taken into custody or otherwise
deprived of his freedom by the authorities in any significant
way and is subjected to questioning," certain procedural safe-
guards must be employed. *Miranda v. Arizona*, 384 U.S. 436,
478 (1966). One such safeguard is that law enforcement must
warn him of his right to the presence of counsel during any
questioning. *Id*. at 479. "If the individual states that he wants
an attorney, the interrogation must cease until an attorney is
present." *Id*. at 474.

In *Edwards* and its progeny, the Supreme Court estab-
lished a brightline rule that when an accused invokes his or
her right to counsel, all further questioning must cease. *Ed-
wards v. Arizona*, 451 U.S. 477, 484–85 (1981). "[W]hether the
accused *actually* invoked his right to counsel," *Smith v. Illinois*,

469 U.S. 91, 95 (1984) (per curiam) (emphasis added), is an objective inquiry, *Davis v. United States*, 512 U.S. 452, 458–59 (1994). The suspect "must unambiguously request counsel." *Davis*, 512 U.S. at 459. Importantly, although the suspect "need not speak with the discrimination of an Oxford don," the invocation must be "sufficiently clear[]" such "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id*.

With these legal principles in mind, we turn to the case before us. Subdiaz-Osorio claims that the Wisconsin Supreme Court defied this clearly established body of federal law when it found that Subdiaz-Osorio did not invoke his Fifth Amendment right to counsel. He argues that the state court, in doing so, committed two legal errors: it ignored the plain meaning of Subdiaz-Osorio's request and it inappropriately relied on post-request context to cast retrospective doubt on the invocation. Subdiaz-Osorio also argues that the state court made unreasonable factual determinations. We take each argument in order.[5]

---

[5] Subdiaz-Osorio also argues that the Wisconsin Supreme Court's constitutional errors were not harmless. Because we find that the state court's decision was a reasonable application of established federal law, we do not reach the harmless error analysis.

**B. Subdiaz-Osorio's request for counsel**

Subdiaz-Osorio's question was translated from Spanish as "[h]ow can I do to get an attorney here because I don't have enough to afford for one." The Wisconsin Supreme Court found that "it appears as though Subdiaz-Osorio was asking about the process of obtaining an attorney rather than asking for counsel to be present during the interview" and therefore it was "reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney for his extradition hearing." *Subdiaz-Osorio*, 2014 WI 87, ¶¶ 86–87. The state court did as it must, following established federal law, and looked to whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. The court did not require Subdiaz-Osorio to speak perfect English or use any magic words; it only required an unambiguous assertion of the right to counsel. *See id.*; *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005). Subdiaz-Osorio's request did not have the "clear" meaning he ascribes to it.

Subdiaz-Osorio delicately parses his statement to try to show that he unambiguously invoked his right to counsel. He specifically identifies two elements: his use of the word "here" and his use of the present tense "can." According to Subdiaz-Osorio, the "here" refers to the interrogation room and the present tense indicates he wanted an attorney now. Viewed in isolation, Subdiaz-Osorio's argument may have some appeal. But the law did not compel the Wisconsin Supreme Court to view the statement in a vacuum. "The context in which Subdiaz-Osorio's question arose is important …." *Subdiaz-Osorio*, 2014 WI 87, ¶ 87; *see Davis*, 512 U.S. at 459. Immediately preceding Subdiaz-Osorio's reference to an

attorney, he and Officer Torres were discussing the extradition process. Subdiaz-Osorio asked if the officers were going to "move [him] to Kenosha," to which Officer Torres explained that Subdiaz-Osorio first "[has] to appear in front of a judge" and "after [he] appear[s] in front of a judge here in Arkansas then they will find out if there is enough reason to send [him] back to Kenosha." Notably, Officer Torres refers to "*here in Arkansas*" right before Subdiaz-Osorio asks how to get an attorney "here."

But, Subdiaz-Osorio insists, the "here" must mean the physical interrogation room because Officer Torres ended the discussion about extradition and changed subjects when he told Subdiaz-Osorio "we are not going to do that *right now*. We are not going to know that *right now*." Justice Abrahamson in her dissent saw it the same way: "The officer made clear that the extradition hearing was no longer the subject of the conversation." *Subdiaz-Osorio*, 2014 WI 87, ¶ 217 (Abrahamson, J., dissenting). We do not need to definitively resolve whether both men were talking about "here" in Arkansas (as opposed to "there" in Kenosha) or "here" in the physical interrogation room. It suffices to say that even under Subdiaz-Osorio's view, Officer Torres, in light of the circumstances, reasonably could have at most "understood only that the suspect *might* be invoking the right to counsel" and he would not have been required to cease questioning. *Davis*, 512 U.S. at 459; *id*. at 460 ("[W]hen the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer," there is no Fifth Amendment violation.). We cannot say that the state court's conclusion was so erroneous to be "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

We find Subdiaz-Osorio's use of the present tense unpersuasive given the circumstances and context of the statement. Subdiaz-Osorio contends that his verb choice—by asking "how *can* I" instead of "how *will* I"—made clear that he wanted an attorney during the interrogation and not at some point in the future. But Subdiaz-Osorio was asking about the *process* of obtaining an attorney. It is not unreasonable to phrase the question about the *process* in the present tense, regardless of whether it is for a present event or future event. And, more importantly, it certainly is not unreasonable, as the Wisconsin Supreme Court concluded, for an officer in Officer Torres's position to understand the question in this manner in the moment.

Though we are cognizant that courts must "give a broad, rather than a narrow, interpretation to a defendant's request for counsel," *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986)), this does not give us free rein to construe "an ambiguous or equivocal reference to an attorney" as a clear invocation of the right to counsel when a reasonable officer in the circumstances might not have understood it as such, *Davis*, 512 U.S. at 459. The broad "scope" the dissent attempts to give Subdiaz-Osorio's words ignores "the context in which they were spoken." *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006); *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) ("The context in which Lord made reference to a lawyer also supports the conclusion that any request for counsel was ambiguous, at best."). Not every "ambiguous or equivocal reference to an attorney" is a valid request for counsel. *Davis*, 512 U.S. at 459. The law requires a clear expression of a present desire for an attorney, and no matter the breadth given, Subdiaz-Osorio's statement failed to meet the requisite level of clarity.

We reiterate that our habeas review is circumscribed and deferential. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct." *Dassey*, 877 F.3d at 302. Reasonable minds may disagree over the correct interpretation of Subdiaz-Osorio's statement, and it may be susceptible to different reasonable interpretations. But the only issue we must confront is whether the state court's "decision was unreasonably wrong under an objective standard." *Id*. (citing *Williams v. Taylor*, 529 U.S. 362, 410–11 (2000) (majority opinion of O'Connor, J.)). The Wisconsin state court did not unreasonably apply clearly established law in finding that Subdiaz-Osorio did not unequivocally invoke his right to counsel.

## C. Postrequest conduct

In *Smith v. Illinois*, the Supreme Court made clear that "an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." 469 U.S. at 91. That is because the Court's precedent set forth a brightline rule "that *all* questioning must cease after an accused requests counsel." *Id*. at 98. Subdiaz-Osorio believes that the state court violated this tenet.

The Wisconsin Supreme Court stated that "[i]t was reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney for his extradition hearing, especially since Subdiaz-Osorio continued to answer questions and remained cooperative for the rest of the interview." *Subdiaz-Osorio*, 2014 WI 87, ¶ 87. The second clause, referring to Subdiaz-Osorio's poststatement conduct, causes us to hesitate. There is no question that if that if the court relied on Subdiaz-Osorio's postrequest cooperation to find ambiguity in the request itself, that reasoning would have gone

beyond *Smith*'s admonition. *See Smith*, 469 U.S. at 98–99 ("Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is even more intolerable."). But that did not happen here.

Subdiaz-Osorio's argument rests on the premise that his request was unambiguous. As we already found, the statement was ambiguous and a reasonable officer in the circumstances could have understood Subdiaz-Osorio to be asking about counsel for the extradition hearing. But even setting that aside and assuming that his request was unambiguous, the Wisconsin Supreme Court did not use his postrequest cooperation to read ambiguity into the statement. *See Smith*, 469 U.S. at 97 ("The courts below were able to construe Smith's request for counsel as 'ambiguous' *only* by looking to Smith's *subsequent* responses to continued police questioning and by concluding that, 'considered in total,' Smith's '*statements*' were equivocal."). Instead, the court had already determined that, applying *Davis*, Subdiaz-Osorio did not unequivocally request counsel to be present during the interrogation. *Subdiaz-Osorio*, 2014 WI 87, ¶ 86. The dissent calls the "especially" statement the "key analysis" to the Wisconsin Supreme Court's holding. But the "especially" clause, itself placed in context, is better read as—unnecessarily and inappropriately—buttressing the court's conclusion rather than relying on the postrequest cooperation to reach its conclusion.

Though the state court's look to Subdiaz-Osorio's postrequest conduct gives us pause, the inclusion of that observation does not render its decision contrary to *Smith*. In line with *Edwards* and its progeny, *Smith* hews to the same rule that a suspect's request must be unambiguous to actually invoke the right to counsel. *See Smith*, 469 U.S. at 98 ("Where nothing

about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease."). Subdiaz-Osorio's cooperation cannot be used to cast doubt on the request itself; but where the request was itself doubtful, the state court did not *use* postrequest conduct to cast any doubt. This is not substituting our "thought as to more supportive reasoning." The Wisconsin Supreme Court's decision fits within the body of clearly established law: "Our case law is clear that it is not enough for a suspect to say something that the interviewer *might* interpret as an invocation of the right to counsel. The invocation of that right must be unequivocal. In this case it was not." *Subdiaz-Osorio*, 2014 WI 87, ¶ 87 (internal citation omitted).

## D. The state court's factual findings

Lastly, Subdiaz-Osorio also argues that the Wisconsin Supreme Court made two unreasonable factual determinations: first, finding that "here" referred back to the extradition process; and second, affording weight to the fact that Subdiaz-Osorio had signed a *Miranda* waiver form. The first factual dispute largely recasts his legal argument, which we have already rejected, and the second is not a fact that is in dispute. In any event, whether a finding of fact or conclusion of law, neither determination was unreasonable. 28 U.S.C. § 2254(d)(2).

With respect to "here," Subdiaz-Osorio argues that it was unreasonable to find that "here" referred to the extradition hearing when there was no reference to a right to counsel at the hearing. He was only informed that he had a right to have counsel present during the interrogation. It follows, according to Subdiaz-Osorio, that the request for counsel *only* could have been regarding the right he was made aware of. This

proves too much. At the threshold it assumes that it is unreasonable for a suspect to think he might have a right to counsel at a court proceeding; a proposition we think untenable. Nothing prevents a suspect from requesting counsel even if he unknowingly does not have a right to one. Stepping over that hurdle, the context leading up to Subdiaz-Osorio's request belies the argument. The immediately preceding discussion between Subdiaz-Osorio and Officer Torres concerned the extradition process. Officer Torres told Subdiaz-Osorio that a hearing would first take place "here in Arkansas," and Subdiaz-Osorio then asked how to "get an attorney here." Officer Torres's indication that they "are not going to do that right now" and "not going to know that right now" does not sever the discussion. In this light, the Wisconsin Supreme Court reasonably determined that "here" referred to the extradition hearing in Arkansas. "Disagreement on a particular judgment call does not show that the state court found the facts unreasonably." *Dassey*, 877 F.3d at 316.

On Subdiaz-Osorio's second point, there was no factual determination regarding the waiver of rights form. It was, and is, undisputed that Subdiaz-Osorio was read his *Miranda* rights and signed the waiver form. That the state court noted this additional fact does not render its decision infirm. *See Subdiaz-Osorio*, 2014 WI 87, ¶ 87 ("In addition, prior to sitting down for the interview, Subdiaz-Osorio signed a waiver of rights form, which Officer Torres had read to him in Spanish."). As the court continued, applying *Edwards* and its progeny, all that means is that after being advised of his *Miranda* rights and validly waiving those rights, a suspect may still "express[] his desire to deal with the police only through counsel" at any time. *Edwards*, 451 U.S. at 484. That expression must be a clear assertion. *Davis*, 512 U.S. at 461 ("We therefore

hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."). That Subdiaz-Osorio did not clearly assert his right to counsel was a reasonable determination and consistent with the evidence and the relevant law.

### III. Conclusion

Subdiaz-Osorio stabbed his brother in the eye and killed him in a drunken fight. He was arrested in Arkansas, presumably on his way to Mexico, and interrogated there by Kenosha police officers. After discussing the extradition process, Subdiaz-Osorio made an ambiguous and equivocal reference to an attorney, asking—as translated from Spanish to English at the suppression hearing—"[h]ow can I do get an attorney here." The state court found that Subdiaz-Osorio did not clearly invoke the right to have counsel present during the interrogation. That decision reasonably applied clearly established federal law and was based on a reasonable determination of facts. The district court's denial of habeas relief is

AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting. The Wisconsin Supreme Court gave two reasons for not honoring Subdiaz-Osorio's request for counsel: (1) he continued to speak to interrogators after asking for a lawyer, and (2) he might have been seeking a lawyer for a future extradition hearing. Both reasons conflict with clear U.S. Supreme Court precedent. First: "Using an accused's subsequent responses to cast doubt on the adequacy of the initial request" for counsel is "intolerable." *Smith v. Illinois*, 469 U.S. 91, 98–99 (1984). Second: courts must "give a broad, rather than a narrow, interpretation to a defendant's request for counsel" and must "presume that the defendant requests the lawyer's services *at every critical stage of the prosecution.*" *Michigan v. Jackson*, 475 U.S. 625, 633 (1986) (emphasis added). As a result, Subdiaz-Osorio's subsequent statements should have been suppressed under *Edwards v. Arizona*, 451 U.S. 477 (1981). Even under the deferential standards of AEDPA, the state court's refusal to do so was an unreasonable application of clearly established Federal law. See 28 U.S.C. § 2254(d)(1). The writ should issue to vacate Subdiaz-Osorio's conviction and to allow retrial only without the statements obtained by violating his constitutional right to counsel.

I.   *Clear Invocation of the Right to Counsel*

To begin, Subdiaz-Osorio unambiguously invoked his Fifth Amendment right to counsel when he said, "how can I do to get an attorney here because I don't have enough to afford for one."[1] The state supreme court, the state, and the

---

[1] As the majority explains, ante at 6 n.3, we can safely assume that Subdiaz-Osorio's statement was grammatical in Spanish; the strange syntax comes from the live translation in the Wisconsin trial court.

panel majority and I all agree that Subdiaz-Osorio thus invoked his right to counsel for *some* purpose. The supposed ambiguity goes only to the *scope* of that request, i.e., whether he was seeking a lawyer for a possible future extradition hearing instead of for the interrogation happening when he made the request. See *State v. Subdiaz-Osorio*, 849 N.W.2d 748, 773 ¶ 87 (Wis. 2014) ("It was reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney *for his extradition hearing* . . . ." (emphasis added)); Appellee's Br. at 27 ("Subdiaz-Osorio was only referring to the assistance of counsel *for the extradition proceedings*, and any invocation of the right to counsel *beyond that* was ambiguous" (emphasis added)); ante at 23 ("the Wisconsin Supreme Court reasonably determined that 'here' referred to the extradition hearing in Arkansas").

The state court also hinted at a broader holding, however, that Subdiaz-Osorio somehow fell short of actually requesting an attorney: "Subdiaz-Osorio was asking about the *process of obtaining an attorney* rather than asking for counsel to be present during the interview." 849 N.W.2d at 773, ¶ 86 (emphasis added). I do not understand the majority to approve this more expansive line of reasoning. That lack of approval is correct. We have repeatedly found unequivocal requests for counsel in similar questions:

- "I have to get me a good lawyer, man. Can I make a phone call?" *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994), citing *Robinson v. Borg*, 918 F.2d 1387, 1391 (9th Cir. 1990).
- "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" *Lord*, 29

F.3d at 1221, citing *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir.1988).

- "Could I get a lawyer?" *United States v. Wesela*, 223 F.3d 656, 661–62 (7th Cir. 2000) (finding no *Edwards* violation, however, because suspect then reinitiated conversation).
- "Can I have a lawyer?" *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005).
- "I mean, but can I call one now? That's what I'm saying." *United States v. Wysinger*, 683 F.3d 784, 795–96 (7th Cir. 2012).
- "Can you call my attorney?" *United States v. Hunter*, 708 F.3d 938, 943 (7th Cir. 2013).

By the logic of Justice Prosser's lead opinion for the Wisconsin Supreme Court, any of these questions *could* be construed as an inquiry into the process of obtaining counsel rather than a demand to have counsel. But people often phrase requests as questions, perhaps to be polite or because they are not confident of their rights, not because they need information. Since the majority does not rely on this artificial distinction, I turn to the two mistaken grounds for decision that the majority embraces.

II. *Unconstitutional Use of Post-Invocation Answers*

The Wisconsin Supreme Court's reliance on Subdiaz-Osorio's post-invocation answers to inject ambiguity into his request was as clear a departure from U.S. Supreme Court precedent as we are likely to see. "Using an accused's subsequent responses to cast doubt on the adequacy of the initial request" is "intolerable." *Smith v. Illinois*, 469 U.S. 91, 98–99 (1984). Yet the majority decides to tolerate the intolerable. The

majority acknowledges the state court's clear departure from controlling law, ante at 21–22, but tries to downplay it, asserting that this "intolerable" rationale merely buttressed a conclusion the state court had already made on other grounds.

I cannot agree. True, the Wisconsin Supreme Court stated its ultimate conclusion up front, without relying on post-invocation answers. See 849 N.W.2d at 773, ¶ 86. But the key analysis came in a single sentence in the next paragraph: "It was reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney for his extradition hearing, *especially since Subdiaz-Osorio continued to answer questions and remained cooperative for the rest of the interview*." *Id.* ¶ 87 (emphasis added). The second clause flatly violates *Smith*, and the state court relied on it—"especially."

Where the state court provides a reasoned opinion, our job is to examine the reasons the court gave. We need not try to imagine permissible ways to uphold the judgment. See *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). We must "respect what the state court actually did" rather than substitute "the federal court's thought as to more supportive reasoning." *Id.* at 1197. The state court explained why it found Subdiaz-Osorio's invocation ambiguous. Its reason flatly contravened Supreme Court precedent. We should take the Wisconsin justices at their word.

III. *Ambiguous Scope of the Invocation*

The other reason the Wisconsin Supreme Court gave was supposed ambiguity as to the *scope*, as opposed to the *existence*, of Subdiaz-Osorio's invocation of the right to counsel. Did he desire counsel for the interrogation he was then undergoing, or for an extradition hearing to take place at some

unknown future time? Both the majority and the Wisconsin Supreme Court assume without argument that ambiguity as to scope falls within the ambit of *Davis v. United States*, which held that "the suspect must unambiguously request counsel" in order to enjoy the protection of *Edwards*. 512 U.S. 452, 459 (1994); see ante at 17; 849 N.W.2d at 772 ¶¶ 84–85. But *Davis* concerned ambiguity as to whether the suspect was invoking the Fifth Amendment right at all, for any purpose. The suspect in *Davis* stated, "maybe I should talk to a lawyer." 512 U.S. at 455. The Supreme Court held that this was not a clear "expression of a desire for the assistance of an attorney." *Id.* at 459.

In this case, by contrast, there was a clear invocation for some purpose. Based solely on the word "here" in Subdiaz-Osorio's request, however, the state court and majority find the request was ambiguous in scope. (We all agree that, without "here," the question "how can I do to get an attorney because I don't have enough to afford one" would be sufficient to require that interrogation stop.) In such cases, the Supreme Court holds, courts must construe the ambiguous scope in the suspect's favor. The state court unreasonably departed from three Supreme Court rulings that set forth this rule: *Jackson*, *Barrett*, and *Minnick*.

I begin with *Connecticut v. Barrett*, 479 U.S. 523 (1987), a case that the majority brushes aside too quickly. See ante at 19. Suspect Barrett had unambiguously invoked the right to counsel but had limited the scope of his invocation to written statements. In particular, Barrett said that "he would not give a written statement unless his attorney was present but had 'no problem' talking about the incident." 479 U.S. at 525. The police toed this line. They continued questioning him only

orally, eliciting a confession. On direct appeal from the Connecticut state courts, the Supreme Court found no violation of the *Edwards* rule given the "ordinary meaning of [Barrett's] statement." *Id.* at 530.

In so holding, however, the Court reinforced the rule that governs Subdiaz-Osorio's case: the *scope* of an invocation of the right to counsel must be construed broadly. The Court endorsed the "settled approach to questions of waiver [that] requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Id.* at 529 (alteration in original), quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986). Granted, such interpretation "is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Id.* Finding no ambiguity as to the limited scope of Barrett's invocation, the Court ruled against him. But if Barrett had been less clear that he was willing to give oral statements, the Court's reasoning would have required excluding the confession. Applied to this case, because even the state court and majority agree it was at least ambiguous whether Subdiaz-Osorio limited the scope of his invocation to a future extradition hearing, the interrogation should have stopped.

*Barrett*'s operative language derived from *Jackson*, 475 U.S. at 625, decided a year earlier. The primary holding of *Jackson* dealt with the effect of a request for counsel at arraignment on later custodial interrogations. That holding was overruled in *Montejo v. Louisiana*, 556 U.S. 778 (2009), and is not relevant here. But *Jackson*'s separate discussion of the scope of waivers of constitutional rights remains good law: "Doubts must be resolved in favor of protecting the constitutional claim." 475 U.S. at 633. As a result, courts must "give a broad, rather than

a narrow, interpretation to a defendant's request for counsel" and "presume that the defendant requests the lawyer's services *at every critical stage of the prosecution*." *Id.* (emphasis added). Once there is an unequivocal invocation of the right to counsel for at least some purpose, in other words, *Davis* no longer applies. Ambiguity as to the invocation's scope is construed in favor of the suspect. Neither *Davis* nor *Montejo* addressed, let alone overruled, this aspect of *Jackson*.

The state court also unreasonably applied the Court's ruling in *Minnick v. Mississippi*, 498 U.S. 146 (1990). In that case, the suspect unambiguously invoked his right to counsel during an interrogation when he said, "Come back Monday when I have a lawyer." *Id.* at 148–49. He was then allowed to consult with an appointed attorney, but on Monday police officers returned and interrogated him without the lawyer present, eliciting incriminating statements. *Id.* at 149. The Mississippi Supreme Court reasoned that, since counsel had been made available in the interim, *Edwards* did not exclude the statements. See 551 So.2d 77, 83 (Miss. 1988).

The U.S. Supreme Court reversed based on the "clear and unequivocal" command of *Edwards*: "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153–54. A clear invocation of the right to counsel should halt interrogation, period. State officials may not weigh whether the suspect desires counsel moment by moment because that would create "a regime in which *Edwards*' protection could pass in and out of existence multiple times prior to arraignment." *Id.* at 154. The state court's judgment that Subdiaz-

Osorio might have wanted a lawyer only for his extradition authorizes just such a regime.

If the federal courts allow evasion of *Edwards* here, we will invite police interrogators to evade controlling federal constitutional law by parsing requests for counsel for arguable ambiguities and then going forward with interrogations anyway. That remains—for now—a high-risk tactic, but the potential for abuse is plain. We can safely assume that custodial interrogations often involve discussions of upcoming proceedings—arraignments, bail hearings, plea bargaining sessions, and more. Neither *Edwards* nor *Davis* nor any other Supreme Court decision has required suspects to exclude these possibilities by specifying when and where they desire counsel. Cf. *Smith*, 469 U.S. at 97 ("Uh, yeah, I'd like to do that" was unambiguous invocation of right to counsel). Instead, under *Barrett*, *Smith*, and *Minnick*, interrogators, state courts, and lower federal courts must presume a request is broad absent unambiguous evidence to the contrary. When Subdiaz-Osorio requested counsel "here," the officers were obliged to halt their interrogation. They could have asked Subdiaz-Osorio to clarify whether he wanted counsel for the interrogation or for the future extradition proceedings. Under *Barrett*, *Smith*, and *Minnick*, however, they could not silently interpret the arguable ambiguity in favor of going forward.

IV. *Harmless Error?*

On appeal, the state argues in the alternative that the Fifth Amendment violation was harmless. The state forfeited this argument by failing to present it to the district court. As we explained in *Rhodes v. Dittmann*, 903 F.3d 646 (7th Cir. 2018), states "can waive or forfeit the harmless error issue," even if

they raised it in state court. See *id.* at 663–64. "It is not the court's job to search the record—without any help from the parties—to determine that the errors we find are prejudicial." *Id.* at 664; see also *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005); *United States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir. 1991). The state's submissions to the district court did not even hint at harmless error.[2]

This court exercises its discretion to overlook a state's failure to argue harmless error only if "the harmlessness of the error or errors found is certain," such that a reversal would lead to "futile proceedings in the district court," *Sanders*, 398 F.3d at 582, or in the state courts for that matter. On habeas review, an error is not harmless if it "had substantial and injurious effect or influence" on the state court proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "[W]hen a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

Under the "grave doubt" standard, it is not at all certain that admitting Subdiaz-Osorio's statements was harmless. As the majority notes, there was significant evidence that Ojeda-Rodriguez, not Subdiaz-Osorio, was the initial aggressor. See ante at 3. After invoking his right to counsel, Subdiaz-Osorio gave contradictory statements to the police concerning who first took out a knife. *Id.* at 3 n.2. The admission of these inconsistent statements in violation of *Edwards* undermined Subdiaz-Osorio's ability to raise self-defense at trial and likely encouraged him to plead guilty.

---

[2] The majority does not reach the issue. Ante at 16 n.5.

Accordingly, I respectfully dissent. I would reverse and grant a writ of habeas corpus.